**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CAROL MCINDOE, as Wrongful
Death Heir, and as Successor-in-
Interest to James McIndoe,
Deceased; LORRAINE MCINDOE;
PAULINE MCINDOE, as Legal Heirs
of James McIndoe, Deceased,
            *Plaintiffs-Appellants*,

v.

HUNTINGTON INGALLS
INCORPORATED, FKA Northrop
Grumman Shipbuilding, Inc.,
            *Defendant*,

and

BATH IRON WORKS CORPORATION,
            *Defendant-Appellee*.

No. 13-56762

D.C. No.
2:12-cv-09639-
RGK-SS

CAROL MᴄINDOE, as Wrongful
Death Heir, and as Successor-in-
Interest to James McIndoe,
Deceased; LORRAINE MᴄINDOE;
PAULINE MᴄINDOE, as Legal Heirs
of James McIndoe, Deceased,
             *Plaintiffs-Appellants*,

                  v.

HUNTINGTON INGALLS
INCORPORATED, FKA Northrop
Grumman Shipbuilding, Inc.,
             *Defendant-Appellee*,

                 and

BATH IRON WORKS CORPORATION,
                 *Defendant*.

No. 13-56764

D.C. No.
2:12-cv-09639-
RGK-SS

OPINION

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted
August 31, 2015—Pasadena, California

Filed March 31, 2016

Before: Alex Kozinski, Diarmuid F. O'Scannlain,
and Jay S. Bybee, Circuit Judges.

Opinion by Judge O'Scannlain

## SUMMARY[*]

### Maritime Law / Asbestos Claims

The panel affirmed the district court's summary judgment in favor of shipbuilders on strict products liability and negligence claims brought under federal maritime law against companies that built naval ships aboard which James McIndoe allegedly was exposed to asbestos.

The panel held that the two naval warships were not "products" for the purposes of strict products liability.

On the general negligence claims, the panel held that there was a genuine issue of fact as to whether McIndoe was exposed to asbestos-containing materials originally installed upon such ships, but not as to whether any such exposure was a substantial contributing factor to his injuries.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Richard M. Grant, Brayton Purcell LLP, Novato, California, argued the cause and filed the briefs for the plaintiffs-appellants.  With him on the briefs was Lloyd F. LeRoy, Brayton Purcell LLP, Novato, California.

Daniel J. Kelly, Tucker Ellis LLP, San Francisco, California, argued the cause and filed the brief for defendant-appellee Huntington Ingalls Incorporated.

Edward R. Hugo, Brydon Hugo & Parker, San Francisco, California, argued the cause and filed the brief for defendant-appellee Bath Iron Works Corporation.  With him on the brief were James C. Parker and Charles S. Park, Brydon Hugo & Parker, San Francisco, California.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether two naval warships are "products" for the purposes of strict products liability and whether a genuine issue of fact exists as to whether asbestos-containing materials originally installed upon such ships caused a decedent's injuries.

I

In the 1960s, James McIndoe served aboard two U.S. Naval ships which contained pipe insulation made from asbestos.  From 1961–1963, he served aboard the *USS Coral Sea*, an aircraft carrier built by a predecessor in interest to

Huntington Ingalls Inc. (Huntington) and commissioned in 1947. From 1966–1967, he served aboard the *USS Worden*, a guided missile cruiser built by Bath Iron Works Corporation (Bath) and commissioned in 1963. Aboard each ship, McIndoe was allegedly present during maintenance work involving the removal of pipe insulation that caused asbestos fibers to float in the air he breathed.

On September 27, 2011, McIndoe died from complications related to mesothelioma, a form of cancer closely associated with asbestos exposure. Plaintiffs-Appellants are McIndoe's legal heirs, who filed suit in California state court against Bath and Huntington,[1] arguing that McIndoe's exposure to asbestos-containing materials aboard their ships contributed to his death. McIndoe's heirs raised design, manufacture, and failure-to-warn claims based on theories of both strict products liability and general negligence. The case was removed to federal district court under 28 U.S.C. § 1442(a)(1), where Bath and Huntington each moved for summary judgment. The district court granted both motions on the grounds that the ships were not products for purposes of strict liability and that the heirs could not establish a genuine issue of material fact regarding whether the shipbuilders were responsible for installing any asbestos-containing insulation that caused McIndoe's injuries. McIndoe's heirs timely appealed, and these cases have been consolidated before our court.

---

[1] The lawsuit also named a number of other defendants who are not parties to this appeal.

II

We review de novo a district court's grant of summary judgment, and, "viewing the evidence in the light most favorable to the nonmoving party, [determine] whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Colwell v. Bannister*, 763 F.3d 1060, 1065 (9th Cir. 2014) (internal quotation marks omitted). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *R.W. Beck & Assocs. v. City & Borough of Sitka*, 27 F.3d 1475, 1480 n.4 (9th Cir. 1994) (internal quotation marks omitted). "Arguments based on conjecture or speculation are insufficient . . . . " *Id.*

Federal maritime law—"an amalgam of traditional common-law rules, modifications of those rules, and newly created rules"—governs this case. *E. River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 865 (1986); *see Wallis v. Princess Cruises, Inc.*, 306 F.3d 827, 840 (9th Cir. 2002) (federal maritime law applies to torts that occur on navigable water and bear a substantial relationship to traditional maritime activity).

III

McIndoe's heirs first argue that Bath and Huntington should be held strictly liable for defects in materials originally installed on the ships they built. The Supreme Court has recognized that federal maritime law incorporates actions for products liability, including those that sound in

strict liability. *E. River S.S. Corp.*, 476 U.S. at 865. The question whether a naval warship is to be considered a "product" in this context, however, appears to be one of first impression for the federal courts of appeals.

When analyzing products-liability claims under maritime law, we look to the Restatement of Torts (the "Restatement")—particularly the most recent Third Restatement—for guidance. *Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 860 (9th Cir. 2011); *see also Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 879 (1997) (citing both Second and Third Restatements in evaluating maritime products-liability action). The Third Restatement defines a "product" subject to strict liability as "tangible personal property *distributed commercially* for use or consumption." Restatement (Third) of Torts: Prods. Liab. § 19(a) (Am. Law Inst. 1998) (emphasis added). "[O]nly when the complained-of injury was allegedly caused by a defect in something within this . . . definition of 'product' should the defendant manufacturer or seller be strictly liable for the harm caused." *Id.* § 19 reporter's note, cmt. a. Injuries caused by other items are actionable only "under negligence, misrepresentation, or some other liability theory." *Id.*

By these terms, the Restatement would exclude warships that were never "distributed commercially" from the realm of strict products liability. This makes sense. The general aim of strict liability is to "plac[e] responsibility on the . . . party most able to prevent harm" caused by dangerous products and thus to incentivize proper "design and quality control" of such products. *All Alaskan Seafoods, Inc. v. Raychem Corp.*, 197 F.3d 992, 995 (9th Cir. 1999) (citing Third Restatement). Therefore, "strict liability should be imposed on the party best able to protect persons from hazardous equipment." *E.*

*River S.S. Corp.*, 476 U.S. at 866. These goals would be advanced little by imposing liability on the builder of a custom-ordered naval ship. As evidence submitted in this case suggests, a ship built under government contract[2] may not even be designed by the builder but instead by the government itself or another outside professional. Further, the shipbuilder does not manufacture—and has little ability to control the quality of—the many thousands of component parts installed on each ship, let alone to account in its pricing for the virtually unlimited liability that would flow from a rule holding it strictly liable for their dangers. We do not believe that federal maritime law—the primary goal of which is to protect and to promote the "smooth flow of maritime commerce," *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 674–76 (1982)—would countenance such a sweeping grant of liability. *See generally Mack v. Gen. Elec. Co.*, 896 F. Supp. 2d 333, 344–46 (E.D. Pa. 2012) (discussing principles of strict liability and maritime law).

We therefore agree with the district court that McIndoe's heirs cannot sustain an action for strict products liability premised upon the notion that the warships in question are

---

[2] McIndoe's heirs do not dispute that Bath and Huntington built the relevant ships pursuant to government contract.

themselves "products" under maritime law.[3] Accordingly, the heirs may prevail only under a theory of negligence.

IV

We turn to the heirs' general negligence claims. To prevail on such claims, they must demonstrate, among other things, that McIndoe's injuries were caused by exposure to asbestos that was attributable to the shipbuilders' conduct. To do so, McIndoe's heirs must be able to show both that he was actually exposed to asbestos-containing materials that were installed by the shipbuilders and that such exposure was a substantial contributing factor in causing his injuries. *Lindstrom v. A-C Prod. Liab. Tr.*, 424 F.3d 488, 492 (6th Cir. 2005). We examine each requirement in turn.

A

First, McIndoe's heirs must show that he was exposed to asbestos from materials that Bath or Huntington installed aboard the *Coral Sea* and *Worden*. The heirs do not claim

---

[3] We express no opinion on the circumstances under which a commercially distributed or mass-produced vessel would qualify as a "product" under maritime law. McIndoe's heirs cite cases in which the manufacturers of such vessels have been held strictly liable for their flaws. But such vessels enter the general stream of commerce in a way custom-built vessels do not, and thus the cases cited say little for the standards that should govern liability for the naval shipbuilders at issue here. *See generally* Restatement (Third) of Torts: Prods. Liab. § 19 cmt. e. (Am. Law Inst. 1998) (distinguishing pre-fabricated or mass-produced homes from those which are built and sold "one house at a time"); *see also Stark v. Armstrong World Indus., Inc.*, 21 F. App'x 371, 378 n.6 (6th Cir. Oct. 3, 2001) ("[Custom-built] vessels resemble custom-designed houses, which are also not likely to be considered 'products' under the Restatement.").

that the shipbuilders were responsible for replacing or maintaining such insulation after the ships were commissioned. Therefore, they must show exposure to asbestos from materials that were *originally* installed aboard the ships. The heirs seek to demonstrate McIndoe's asbestos exposure through the first-hand observations of two lay witnesses and, based on these observations, the opinion of one purported expert.

Regarding the *USS Coral Sea* (built by Huntington and commissioned in 1947), McIndoe's heirs offered a declaration of Brian Tench, who boarded the ship as an ensign in 1961 and spent significant time with McIndoe in engineering spaces of the ship. Tench testified that there were insulated steam pipes throughout the engineering spaces in which he worked with McIndoe; that "[b]ased on his training and experience," he knew such insulation contained asbestos;[4] that, he saw McIndoe in the area of others removing asbestos-containing insulation on 20–30 different occasions; and that the removal of the insulation created "large amounts of visible dust" in the air McIndoe breathed. Tench states that he knows some of the removed pipe insulation was original to the ship because he could tell from the thickness of the paint on the insulation that it had been painted 6–8 times, indicating to him that it must have been aboard the ship for some time.

---

[4] It is not clear from Tench's declaration how he obtained this knowledge, other than his conclusory statements that he came to learn it. And there is some reason to doubt that Tench's knowledge could be established at trial, given his statement that he relied at least partly on statements of others who said that the insulation contained asbestos.

Regarding the *USS Worden* (built by Bath and commissioned in 1963), McIndoe's heirs offered a declaration of Thomas Sappington, who boarded the ship in 1964 and worked for two years in one of the ship's fire rooms. Sappington declared that there were thousands of feet of insulated pipe in the fire rooms; that McIndoe was "often" present when maintenance was performed, which involved the removal of pipe insulation; and that the process of removing the insulation created visible dust in the air McIndoe breathed. Much like Tench, Sappington declared that he could distinguish the ship's original pipe insulation from later-installed replacement insulation based on visible seams between new and old insulation and on variances in the thickness of their paint,[5] and that he believes much of the insulation removed in McIndoe's presence was original to the ship.

McIndoe's heirs built upon these accounts through the declaration of Charles Ay, a professional asbestos consultant who worked aboard hundreds of naval ships as a pipe insulator in the 1960s–1980s. Ay stated that, based on his experience, he knew that insulation used on high-pressure pipelines in Naval ships built in the 1940s–1960s always contained asbestos; that nearly half of all originally installed insulation aboard such vessels was not removed during the life of the ship; that during McIndoe's time aboard the *Coral Sea*, at least 70 percent of the original asbestos-containing insulation would have remained; that during McIndoe's time aboard the *Worden*, "virtually all" of the original insulation would have remained; and that he personally saw thousands

---

[5] Like Tench, Sappington also refers to statements of others who told him which sections of insulation had been replaced and which were original.

of lineal feet of asbestos-containing pipe insulation while working as an insulator aboard each ship (in the mid-1960s on the *Worden* and the 1970s on the *Coral Sea*). Based on his experience and the statements of Tench and Sappington, Ay concluded that it is "virtually impossible" that McIndoe would have avoided being exposed to asbestos dust from original insulation during his time aboard each ship.

We agree with the district court that the evidence that McIndoe was exposed to asbestos originally installed by the shipbuilders is not especially strong. The only direct evidence presented to support the claim that such insulation was removed in McIndoe's presence is the rather implausible testimony of Tench and Sappington that, nearly 50 years later, they recall the thickness of the paint on the removed insulation to such a degree that they can surmise the age of the insulation. To these direct accounts, Ay can add only his speculation as to what materials a person in McIndoe's position would have encountered, with no actual knowledge of McIndoe's activities aboard the ships. Nevertheless, viewing these statements in the light most favorable to the plaintiffs, *Colwell*, 763 F.3d at 1065, we conclude that a jury *could* determine that McIndoe was exposed to originally installed asbestos, even if it seems unlikely that a jury *would* do so. Such evidence therefore creates a genuine issue of fact regarding whether McIndoe was at least exposed to asbestos from the shipbuilders' materials.

B

But even if the evidence may establish that McIndoe was actually exposed to asbestos installed by the shipbuilders, his heirs still must show that any such exposure was a *substantial*

*contributing factor* to his injuries.[6]  *Lindstrom*, 424 F.3d at 492.

1

Absent direct evidence of causation, a party may satisfy the substantial-factor test by demonstrating that the injured person had substantial exposure to the relevant asbestos for a substantial period of time.  *See id.*; *see also Menne v. Celotex Corp.*, 861 F.2d 1453, 1462 (10th Cir. 1988) ("More significant under traditional causation tests than the question of mere exposure to [asbestos-containing] products is whether the exposure was sufficiently sustained (or frequent) and intense to constitute a proximate cause of [the plaintiff's] mesothelioma.").  Evidence of only minimal exposure to asbestos is insufficient; there must be "a high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural."  *Lindstrom*, 424 F.3d at 492 (internal quotation marks omitted).

McIndoe's heirs failed to put forward such evidence here. Even crediting the assertions of their two first-hand

---

[6] *Lindstrom*, from the Sixth Circuit, appears to be the only federal Court of Appeals decision to consider squarely  the causation standard applicable to asbestos claims under maritime law.  But the Sixth Circuit's analysis comports with the general approach taken by other federal courts in asbestos cases, and we agree with the district court and the parties that such standard governs our analysis.  *See also Benefiel v. Exxon Corp.*, 959 F.2d 805, 807 (9th Cir. 1992) (applying "substantial factor" requirement to maritime tort); *Curtis v. ABB Inc.*, 622 F. App'x 661 (9th Cir. Nov. 13, 2015) (mem.) (applying *Lindstrom* to asbestos claim); Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 36, reporter's note, cmt. b (Am. Law Inst. 2010) (citing numerous jurisdictions that employ the substantial-factor standard to limit scope of liability in asbestos cases).

witnesses, at most the heirs have provided evidence that McIndoe was "frequently" present during the removal of insulation aboard the *Worden* and was present 20–30 times during such removal aboard the *Coral Sea*.  But, as the district court found, even if McIndoe was around asbestos dust several times, his heirs presented no evidence regarding the *amount* of exposure to dust from originally installed asbestos, or critically, the *duration* of such exposure during any of these incidents.  Without such facts, McIndoe's heirs can only speculate as to the actual extent of his exposure to asbestos from the shipbuilder's materials.  At this stage, more is needed.  *See Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011); *R.W. Beck & Assocs.*, 27 F.3d at 1480 n.4.

2

The heirs do not seriously contend that they provided evidence demonstrating that McIndoe suffered substantial exposure to originally installed asbestos for a substantial period of time.  Instead, they argue that evidence of prolonged exposure is not needed, because they presented the opinion of Dr. Allen Raybin—a medical expert who asserted that *every* exposure to asbestos above a threshold level is necessarily a substantial factor in the contraction of asbestos-related diseases.

The district court properly rejected this argument. McIndoe's heirs appear to have introduced Dr. Raybin's testimony and his "every exposure" theory of asbestos causation to reject the substantial-factor test as a whole.  Dr. Raybin did not speak to the severity of McIndoe's own asbestos exposure beyond the basic assertion that such exposure was significantly above ambient asbestos levels.

More critically, Dr. Raybin did not speak to the severity of McIndoe's exposure to *originally installed* asbestos—and generally did not make distinctions between the overall dose of asbestos McIndoe breathed aboard the ships and that portion of such exposure which could be attributed to the shipbuilders' materials.[7]  Likewise, Dr. Raybin did not opine on the *effect* of McIndoe's actual exposure to the shipbuilders' asbestos-containing materials, except in the broadest sense.  Namely, while Dr. Raybin concluded that the exposures described by Sappington and Tench would have substantially contributed to McIndoe's injuries, he explicitly and directly based such conclusion on his "each and every exposure" theory of causation.  Taken together, Dr. Raybin's testimony aims more to establish a legal conclusion—what general level of asbestos exposure is required to show disease causation—than to establish the facts of McIndoe's own injuries.

McIndoe's heirs cite no case approving the use of such a sweeping opinion to satisfy causation under maritime law.  Indeed, in *Lindstrom*, the Sixth Circuit explicitly rejected an argument similar to the heirs', concluding that such a theory of liability would render the substantial-factor test essentially meaningless.  *See* 424 F.3d at 493.  Allowing causation to be established through testimony like Dr. Raybin's would "permit imposition of liability on the manufacturer of any

---

[7] To the extent that Dr. Raybin attempted to assert that the encounters described by Tench and Sappington "are high level exposures that occurred for a prolonged period of time," he had no basis on which to do so.  As described above, Tench and Sappington failed to provide information regarding the intensity or duration of McIndoe's alleged exposures to originally installed asbestos aboard the *Worden* and *Coral Sea*; McIndoe's heirs cannot rely on a third-party expert to fill in those percipient gaps for them.

[asbestos-containing] product with which a worker had the briefest of encounters on a single occasion." *Id.* This is precisely the sort of unbounded liability that the substantial factor test was developed to limit. *See* Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 36 reporter's note, cmt. b (Am. Law Inst. 2010). Because the heirs' argument would undermine the substantial factor standard and, in turn, significantly broaden asbestos liability based on fleeting or insignificant encounters with a defendant's product, we, too, reject it.[8]

Notwithstanding the declaration of Dr. Raybin, McIndoe's heirs failed to put forward evidence demonstrating that McIndoe was substantially exposed to asbestos from the shipbuilders' materials for a substantial period of time. The heirs have established no genuine issue of fact regarding whether any such exposure was a substantial factor in McIndoe's injuries, and thus they cannot prevail on their general negligence claims.[9] *See Lindstrom*, 424 F.3d at 492–93.

---

[8] As the Sixth Circuit acknowledged, rejection of this argument still allows a plaintiff to satisfy causation through expert testimony that the plaintiff's actual exposure to certain materials substantially contributed to the development of his injuries. It simply prevents the type of sweeping testimony offered here—that *all* exposures to asbestos above background levels necessarily and substantially contribute to development of diseases like mesothelioma. *See Lindstrom*, 424 F.3d at 493.

[9] Because we conclude that McIndoe's heirs cannot establish a prima facie case for their claims, we do not consider the shipbuilders' asserted affirmative defenses.

V

The judgment of the district court is **AFFIRMED**.