177 Cal.App.4th 1348 (2009)
RICHARD MERRILL et al., Plaintiffs and Appellants,
v.
LESLIE CONTROLS, INC., Defendant and Appellant;
ELLIOTT COMPANY, Defendant and Respondent.
No. B200006.
Court of Appeals of California, Second District, Division Three.
September 25, 2009.
CERTIFIED FOR PARTIAL PUBLICATION[*]
*1352 Simon, Eddins & Greenstone and Brian P. Barrow for Plaintiffs and Appellants.
Gordon & Rees, James G. Scadden, Don Willenburg; Munger, Tolles & Olson, Mark H. Epstein, Paul J. Watford and Julie D. Cantor for Defendant and Appellant.
Crowell & Moring, Steven P. Rice, William L. Anderson and Natalia R. Medley for The Coalition for Justice, Inc., as Amicus Curiae on behalf of Defendant and Appellant.
Walsworth, Franklin, Bevins & McCall, Michael T. McCall, Thomas G. Scully and Sean P. Martin for Defendant and Respondent.

*1353 OPINION
KITCHING, J. 

I. INTRODUCTION
In this products liability lawsuit, plaintiffs Richard Merrill and Tamara Merrill sued defendants Leslie Controls, Inc. (Leslie Controls), and Elliott Company for Richard Merrill's injuries caused by exposure to asbestos-containing products. Leslie Controls appeals from a judgment for plaintiffs. We conclude that plaintiffs have not shown that Leslie Controls manufactured, supplied, or distributed the products which caused his exposure to asbestos. Therefore under Taylor v. Elliott Turbomachinery Co., Inc. (2009) 171 Cal.App.4th 564 [90 Cal.Rptr.3d 414] (Taylor), Leslie Controls is not liable in strict liability for failing to warn of the dangerous properties of those products or for a design defect in those products. We reverse the judgment.[1]

II. PROCEDURAL HISTORY
On May 10, 2006, plaintiffs Richard Merrill and Tamara Merrill filed a complaint for personal injury arising from Richard Merrill's exposure to asbestos from defendants' asbestos and/or asbestos-containing products aboard United States Navy vessels. The complaint named more than 30 defendants, including Leslie Controls and Elliott Company. The complaint alleged causes of action for strict liability and negligence and a claim under Civil Code section 3294 for exemplary damages because of defendants' alleged malice and oppression. Tamara Merrill alleged a cause of action for loss of consortium.
Leslie Controls and Elliott Company filed motions for summary judgment and for summary adjudication of Tamara Merrill's cause of action for loss of consortium. The trial court denied Leslie Controls's motion for summary judgment, but granted its motion for summary adjudication of Tamara Merrill's loss of consortium cause of action. The trial court granted Elliott Company's motion for summary judgment, and also granted Elliott Company's motion for summary adjudication of Tamara Merrill's loss of consortium cause of action.
Before the verdict, plaintiffs and 16 defendants settled, with the settling defendants agreeing to pay plaintiffs $5,518,000. After a trial, the jury by *1354 special verdict found in favor of three remaining defendants, but found against defendant Leslie Controls. The jury found that there was a defect in Leslie Controls valves because of a failure to warn of potential risks that were known or knowable in light of generally recognized and prevailing best medical and scientific knowledge at the time of manufacture and distribution, and that there was a defect in the design of Leslie Controls valves. The jury also found that Leslie Controls was negligent. The jury found that the failure to warn and design defects, and the negligence, of Leslie Controls were a substantial contributing factor in causing Richard Merrill's malignant mesothelioma, and found total damages suffered by Merrill to be $5,691,124. The jury allocated 15 percent of the total fault that caused Richard Merrill's injury to Leslie Controls. The judgment on special verdict entered on March 23, 2007, ordered that Richard Merrill recover $1,218,565 from Leslie Controls.
On May 16, 2007, the trial court denied the motions by Leslie Controls for judgment notwithstanding the verdict and for a new trial. In a notice of appeal filed on June 14, 2007, plaintiff Tamara Merrill appealed from the order granting summary adjudication for Leslie Controls on Tamara Merrill's loss of consortium cause of action, and she and Richard Merrill appealed from the order granting summary judgment to Elliott Company.
On July 5, 2007, defendant Leslie Controls filed a notice of appeal from the March 23, 2007, judgment.

III. FACTS
Plaintiff Richard Merrill served in the United States Navy from 1959 to 1979. He enlisted in the Navy three days after graduating from high school, underwent recruit training, and then attended Machinist's Mate "A" School in Great Lakes, Illinois. A machinist's mate works with mechanical, hydraulic, and steam systems, repair operations, maintenance of equipment in engine rooms on board ships, and repair and maintenance of refrigeration, laundry, and galley equipment. After training, he worked as a machinist's mate fireman apprentice on cruisers which had been decommissioned after World War II and were being updated with missile systems and being brought back into service.
During his naval service, Merrill served on four United States Navy ships. All of the ships had Leslie Controls valves, and could not operate without them. Later in his naval career Merrill became an instructor in the Naval Engineering Officer's School in San Diego, where he taught junior officers the principles of a steam system. At the time he was honorably discharged, he was a senior chief machinist's mate. Merrill testified that during his United *1355 States Navy service, he never saw a warning concerning the hazards of asbestos on the equipment he worked on, and the Navy never gave any warning that he knew of.
On two of the ships Merrill worked on, the boiler room and engine room were separate; on two other ships he worked on, the boiler and engine were in one room. These rooms were below decks and had no natural light. The equipment in those rooms were boilers, turbines, and pumps. Each of the engine rooms and boiler rooms had several Leslie Controls pressure-reducing valves. Each ship had 25 to 35 controls or valves manufactured by Leslie Controls, and Merrill estimated that he personally worked on 100 Leslie Controls valves during his naval career. Ships are powered by steam from boilers heated by fuel oil or JP-5 aviation fuel. High-pressure steam travels to turbines, which are connected through a reduction gear to a shaft that turns propellers to move the ship. Steam from boilers also powers generators that provide electricity for the ship, pumps that move fluids around the ship, and auxiliary systems such as heaters, airjectors, laundry steam presses, and galley steam tables. Leslie Controls valves controlled the movement and pressure of steam to turbines and other steam-powered equipment. Leslie Controls valves required frequent maintenance.
Leslie Controls is based in Tampa, Florida. Since the early 1900's to the 1980's, Leslie Controls manufactured pressure-reducing valves with internal asbestos-containing gaskets. In the 1940's, Leslie Controls introduced control valves; the control valves used on steam applications contained one or two internal asbestos-containing gaskets. Leslie Controls sold these control valves to the United States Navy for installation on naval vessels. Leslie Controls did not manufacture the internal asbestos-containing gaskets used in its valves, but instead purchased them from another supplier and installed them into its products. When Leslie Controls shipped valves and pressure regulators to customers, they already contained asbestos-containing component parts, in the form of internal gaskets and packing material.
Leslie Controls also sold asbestos-containing internal gaskets and packing as replacement parts, although Leslie Controls did not manufacture the gaskets and packing. The asbestos in Leslie Controls's products was chrysotile, purchased from outside vendors, and was contained in gaskets, packing, and whistles. Leslie Controls sold these products to the United States government for use on military ships and to commercial customers. The valves were manufactured according to military specifications, including packets and gaskets contained in the valve. Those specifications required use of asbestos.
Leslie Controls instructed purchasers of its pressure-reducing valves: "Insulate all pipe before and after reducing valve to minimize condensation." *1356 Leslie Controls, however, did not provide that insulation. A defense witness, retired Admiral Roger Horn, Jr., testified that Leslie Controls would expect that its steam valves would be insulated. Leslie Controls also employed field engineers during the 1960's when the Navy was engaged in overhauling ships and in sea trials. As early as 1962 and continuing into the 1980's, the Leslie Controls field service engineers were present when amosite insulating pads were removed, valves were unbolted and disassembled, internal parts were changed and internal surfaces cleaned, and as the valve was reinstalled and put in service. The Leslie Controls field service engineers were aware that amosite asbestos insulation was applied to and removed from Leslie Controls valves.
Leslie Controls supplied purchasers of valves with technical manuals containing instructions on repairing and maintaining Leslie Controls valves. Leslie Controls did not place warnings or cautions in brochures or technical manuals which advised customers about dangers or hazards of asbestos, or of asbestos-containing component parts such as gaskets or packing material. From the 1940's through the 1970's, Leslie Controls understood that asbestos packing material would have to be removed during maintenance of a piece of equipment, or that additional packing would be added. Leslie Controls also understood that there would be workers working around steam piping systems and pressure regulators on board naval vessels. Leslie Controls did not place warnings about the dangers or hazards of asbestos on any of their products containing asbestos-containing component parts which it sold to the Navy.
Merrill was exposed to asbestos in three ways. First, Leslie Controls-manufactured valves had internal packing and internal gaskets within the metal housing of the valve. This internal packing and gaskets, which contained asbestos, prevented leaks of steam from the movable valve stem. The internal packing material and internal gaskets would have to be removed, added to, or replaced during maintenance of the valve. We will refer to this internal packing and gaskets as "Category #1." On Leslie Controls-manufactured valves with flanges protruding from each side, Merrill repacked the valve wheel and removed flanges to which pipe was bolted. This involved pulling the old packing out of the Leslie Controls valve, using a corkscrew like packing puller, and blowing air at low pressure to clean out debris. Then Merrill would cut new packing and install it. This exposed him to asbestos. When Merrill was required to take the valve apart he had to remove asbestos-containing internal gaskets from inside of the valve, which exposed him to airborne asbestos.
Second, Merrill was exposed to asbestos when removing gaskets on the exterior of Leslie Controls valves. We will refer to these external flange gaskets as "Category #2." A gasket is placed between two metal surfaces, *1357 which are bolted together to compress the gasket material to form a seal between the valve flange and the steamline pipe flange. Merrill removed gaskets from the Leslie Controls valves when those valves were sent to the machine shop for maintenance. The gaskets contained asbestos. Sheet gaskets had to be scraped off in places and then wire brushed, because sheet material had a tendency to deteriorate or stick to hot metal surfaces. Taking the valve apart to remove asbestos gaskets from the inside would expose Merrill to asbestos. Leslie Controls did not design, manufacture, supply, or install the flange gaskets attached to the exterior of its valves.
Third, asbestos insulation pads covered the body of the Leslie Controls valve and surrounding pipe connected to it, in order to protect workers from being burned. We will refer to the asbestos insulation as "Category #3." Asbestos insulation also improved efficiency of the system by preventing steam from condensing into water and reducing energy costs necessary to keep steam at the proper temperature. When a valve needed repair, Merrill had to remove the insulation pad and to reinstall it after the repair was completed. The insulating pads contained amosite asbestos. Removing and manipulating the insulating pad produced asbestos dust and visible airborne particulates. In this manner Merrill was exposed to airborne asbestos particulates. Similarly, a Leslie Controls regulator for a turbine-driven pump had two valves, one for a steam inlet coming off the auxiliary steam system, and a second on the other side for a steam outlet from the reducer. Asbestos insulation was on these pipes. It had to be removed when the valve was sent for repair. When asbestos insulating pads were removed, at times there would be dust. Leslie Controls did not supply the asbestos insulation for the exterior of the valves; that asbestos insulation was installed by the shipyard that built the ship.
Additionally, asbestos insulation was found on much of the equipment in boiler rooms and engine rooms on Navy ships. As much as 95 percent of the asbestos insulation on a ship was installed on piping. Depending on the size of a ship, this could range from 22 tons to 400 tons of asbestos insulation.

IV. ISSUES
The main issue in this appeal is whether Leslie Controls could be held liable in strict liability for failing to warn about hazards posed by asbestos-containing products, or for a design defect in asbestos-containing products, which Leslie Controls did not manufacture, supply, or place in the chain of distribution.
*1358 In their appeal, plaintiffs claim that:
1. The trial court erroneously granted the motion by Leslie Controls for summary adjudication in plaintiff Tamara Merrill's cause of action for loss of consortium; and
2. The trial court erroneously granted summary judgment in favor of defendant Elliott Company.

V. DISCUSSION
The jury awarded damages based on its finding that Leslie Controls was strictly liable for failure to warn of defects in its products and for a design defect in its products, and was also negligent. After analyzing the requirements of a cause of action for strict liability and for negligence, we conclude that Leslie Controls is not liable under any of these theories.

A. Leslie Controls Is Not Liable in Strict Liability for Failure to Warn

(1) Strict liability based on a failure to warn will not be imposed on a defendant which is not in the chain of distribution of the product whose defect caused a plaintiff's injury, and Leslie Controls was not required to give warnings of potential hazards in products of another. (Taylor, supra, 171 Cal.App.4th at p. 575.) Under the component parts doctrine, moreover, a manufacturer of a product component is not liable for injuries caused by the product into which the component is incorporated unless the component itself was defective when it left the manufacturer. (Id. at p. 584.)
There is no evidence that Leslie Controls manufactured or supplied any asbestos-containing internal packing and gaskets (Category #1) that harmed plaintiff. In addition Leslie Controls did not manufacture or supply the flange gaskets that the Navy attached to the exterior of Leslie Controls valves (Category #2) or the asbestos-containing insulation (Category #3). Therefore Leslie Controls is not liable in strict liability for failing to warn of hazards associated with the handling of these products.

1. Strict Liability for Failure to Warn

(2) California products liability law generally makes manufacturers, retailers, and others in the marketing chain of a product strictly liable in tort for personal injuries caused by a defective product. (Peterson v. Superior Court (1995) 10 Cal.4th 1185, 1188 [43 Cal.Rptr.2d 836, 899 P.2d 905].) California law imposes strict products liability for three types of product defects: (1) manufacturing defects; (2) design defects, and (3) warning defects. (Anderson v. Owens-Corning Fiberglas Corp. (1991) 53 Cal.3d 987, *1359 995 [281 Cal.Rptr. 528, 810 P.2d 549].) The third category defines "products that are dangerous because they lack adequate warnings or instructions." (Barker v. Lull Engineering Co. (1978) 20 Cal.3d 413, 428 [143 Cal.Rptr. 225, 573 P.2d 443].) "`[A] product flawlessly designed and produced may nevertheless possess such risks to the user without a suitable warning that it becomes "defective" simply by the absence of a warning.'" (Finn v. G. D. Searle & Co. (1984) 35 Cal.3d 691, 699 [200 Cal.Rptr. 870, 677 P.2d 1147].) In such a case a manufacturer must warn consumers about hazards inherent in their products. (Johnson v. American Standard, Inc. (2008) 43 Cal.4th 56, 64 [74 Cal.Rptr.3d 108, 179 P.3d 905].)
(3) Strict liability is imposed on a defendant which has marketed or distributed a defective product (Daly v. General Motors Corp. (1978) 20 Cal.3d 725, 739 [144 Cal.Rptr. 380, 575 P.2d 1162]) or which is an entity in the chain of distribution of the injury-causing manufactured product (Edwards v. A.L. Lease & Co. (1996) 46 Cal.App.4th 1029, 1033 [54 Cal.Rptr.2d 259]). The plaintiff bears the burden of linking the injury-producing product with a particular entity in the chain of distribution by evidence that establishes that "`(1) the defendant received a direct financial benefit from its activities and from the sale of the product; (2) the defendant's role was integral to the business enterprise such that the defendant's conduct was a necessary factor in bringing the product to the initial consumer market; and (3) the defendant had control over, or a substantial ability to influence, the manufacturing or distribution process.'" (Taylor, supra, 171 Cal.App.4th at p. 576.)
Liability for defective products is strict, but not absolute. (Carlin v. Superior Court (1996) 13 Cal.4th 1104, 1110 [56 Cal.Rptr.2d 162, 920 P.2d 1347].) Strict liability will not be imposed on an entity that does not manufacture or market the allegedly defective product that caused a plaintiff's injury. (Peterson v. Superior Court, supra, 10 Cal.4th at p. 1188.)

2. Leslie Controls Was Not Part of the Chain of Distribution of the Asbestos-containing Flange Gaskets or Insulation

(4) A defendant which does not produce or market asbestos-containing materials, and which is not part of the chain of distribution of such materials, cannot be strictly liable for failing to warn of danger inherent in those asbestos-containing products. (Taylor, supra, 171 Cal.App.4th at p. 579.)
(5) Leslie Controls did not design, manufacture, supply, or install the flange gaskets (Category #2) attached to the exterior of its valves. Leslie Controls did not provide the asbestos insulation (Category #3) used on portions of its valves and on piping connected to the valves; the shipyard that *1360 built the ship installed that insulation. Consequently they cannot be held strictly liable for such products. (Taylor, supra, 171 Cal.App.4th at p. 579.)
With regard to the remaining category of asbestos-containing materials, internal packing and gaskets (Category #1), Leslie Controls did not manufacture the internal packing and gaskets which it installed in its valves when delivered to the Navy. The presence of these asbestos-containing products in Leslie Controls valves did place Leslie Controls within the chain of distribution. Plaintiff Merrill removed internal packing and gaskets from Leslie Controls valves, cleaned the valve of debris, and cut and installed new packing. Merrill did not provide evidence, however, that Leslie Controls supplied the old internal packing and gaskets which he removed or supplied the new packing he installed. Therefore he has not met his burden of linking the injury-producing product with Leslie Controls in the chain of distribution. (Taylor, supra, 171 Cal.App.4th at pp. 576, 579.) Therefore Leslie Controls cannot be held strictly liable for failing to warn of danger inherent in such products.

3. Leslie Controls Had No Duty to Warn of Defects in Another Manufacturer's Products

Merrill argues that Leslie Controls was required to warn about all foreseeable hazards associated with its valves, including those arising from asbestos-containing products which Leslie Controls did not supply but which were used in association with its valves. Where Leslie Controls valves did not cause the injury, however, and instead the injury was caused by products made or supplied by other manufacturers and used in conjunction with Leslie Controls valves, Leslie Controls had no duty to warn.
(6) A manufacturer's duty to warn is limited to its own products. "Although a manufacturer may owe a duty to warn when the use of its product in combination with the product of another creates a potential hazard, that duty arises only when the manufacturer's own product causes or creates the risk of harm." (Taylor, supra, 171 Cal.App.4th at p. 580.) A failure to warn may create liability for harm caused by the use of an unreasonably dangerous product, but the rule does not apply when the facts show that the injury was not caused by any unreasonably dangerous condition or feature of defendant's product. A manufacturer is not liable for failing to warn of a possible defect in the product of another. (Garman v. Magic Chef, Inc. (1981) 117 Cal.App.3d 634, 639 [173 Cal.Rptr. 20].) Where the harm is caused by the product of another, and not by any unreasonably dangerous condition or feature of defendant's product, that defendant can bear no liability for failure to warn of harm caused by use of an unreasonably dangerous product. (Blackwell v. Phelps Dodge Corp. (1984) 157 Cal.App.3d 372, 377 [203 *1361 Cal.Rptr. 706].) Thus "the manufacturer's duty is restricted to warnings based on the characteristics of the manufacturer's own product. . . . the law does not require a manufacturer to study and analyze the products of others and to warn users of risks of those products. A manufacturer's decision to supply warnings, and the nature of any warnings, are therefore necessarily based upon and tailored to the risks of use of the manufacturer's own product." (Powell v. Standard Brands Paint Co. (1985) 166 Cal.App.3d 357, 364 [212 Cal.Rptr. 395], second italics added, citations omitted; see also In re Deep Vein Thrombosis (N.D.Cal. 2005) 356 F.Supp.2d 1055, 1068, and Taylor, at pp. 579-583.)
Since plaintiffs have not provided evidence that Leslie Controls supplied the old internal gaskets and packing that Merrill removed or the new internal gaskets and packing that he installed (Category #1), and because the evidence is undisputed that Leslie Controls did not manufacture or supply the asbestos-containing flange gaskets or insulation (Categories #2 and #3), Leslie Controls was not required to give warnings about those other products.
Two Washington Supreme Court cases support this analysis. In Simonetta v. Viad Corp. (2008) 165 Wn.2d 341 [197 P.3d 127] (Simonetta), plaintiff Simonetta served as a fireman and machinist mate on a United States Navy ship, the USS Saufley, in 1958 and 1959, where he performed maintenance on an evaporator that converted sea water to fresh water. In 1941 or 1942, when the Saufley was built, the defendant's predecessor manufactured the evaporator, which was insulated with asbestos products manufactured by another company and installed by the Navy or another entity. To service the evaporator, Simonetta pried or hacked away asbestos insulation with a hammer and then reinsulated the machine. Simonetta was diagnosed with lung cancer, which his medical expert testified was caused by his exposure to asbestos while in the Navy. Simonetta filed strict liability and negligence claims against defendant Viad Corporation (Viad) for failure to warn of the hazards of asbestos exposure, but did not know the identity of the company that manufactured or installed the insulation on the evaporator. (Id., 197 P.3d at p. 130.) Simonetta appealed the grant of summary judgment for Viad on the issue of duty to warn. The Court of Appeal reversed the judgment, and its judgment was in turn reversed by the Washington Supreme Court.
(7) Simonetta stated the rule of strict liability with respect to unreasonably dangerous products: "a product, though faultlessly manufactured and designed, may not be reasonably safe when placed in the hands of the ultimate user without first giving an adequate warning concerning the manner in which to safely use the product. Liability is imposed on parties in the chain of distribution, including sellers, wholesale or retail dealers or distributors, and manufacturers." (Simonetta, supra, 197 P.3d at p. 134.) Liability for *1362 failure to provide this warning, however, does not extend to failure to warn of dangers inherent in another product not manufactured, supplied, or sold by the defendant. Viad sold the evaporator without insulation and did not manufacture, sell, or select the asbestos insulation. Simonetta determined that the asbestos insulation, not Viad's evaporator, caused the plaintiff's injury. (Id. at pp. 136, 138.) Viad was not in the chain of distribution of the dangerous product, and therefore could not be held strictly liable for failing to warn about asbestos contained in another manufacturer's product. (Id. at pp. 138, 134.)
The facts in the second Washington Supreme Court case, Braaten v. Saberhagen Holdings (2008) 165 Wn.2d 373 [198 P.3d 493] (Braaten), closely resemble those in this appeal. In Braaten, the defendants manufactured pumps and valves sold to the Navy for use aboard naval ships. The defendants did not manufacture the asbestos-containing insulation which the Navy used to insulate the defendants' products and did not manufacture asbestos-containing packing and gaskets originally contained within the defendants' products. Plaintiff Braaten worked as a pipefitter on Navy ships from 1967 to 2002. In 2003, he was diagnosed with mesothelioma allegedly resulting from his exposure to asbestos when he performed maintenance on pumps and valves manufactured by the defendants. Braaten's work required removal of exterior asbestos-containing insulation and reapplication of insulation, and removal of old asbestos-containing packing and replacement of that packing. Asbestos gaskets and packing usually had to be ground, scraped, or chipped off, which released respirable asbestos. Braaten testified that he never installed or worked on pumps when they were new and was not exposed to asbestos when others installed new pumps. It was not possible to tell how many times original packing and gaskets in valves and pumps had been replaced with packing and gaskets manufactured by other companies. (Id., 198 P.3d at p. 496.)
(8) Braaten relied on the holding of Simonetta: "[A] manufacturer is not liable for failure to warn of the danger of exposure to asbestos in insulation applied to its products if it did not manufacture the insulation and was not in the chain of distribution of the insulation. It makes no difference whether the manufacturer knew its products would be used in conjunction with asbestos insulation." (Braaten, supra, 198 P.3d at p. 498.) Plaintiff Braaten had not presented sufficient evidence to withstand summary judgment as to whether the defendants manufactured, sold, or were otherwise in the chain of distribution of asbestos-containing insulation applied to their products. Braaten therefore found the defendant manufacturers were not liable for failure to warn of the danger of exposure during maintenance of their products to asbestos-containing insulation manufactured and supplied by third parties. (Id. at p. 500.) With regard to asbestos in packing and gaskets, the evidence did not establish that Braaten was exposed to asbestos-containing packing or *1363 gaskets in products when they were originally supplied by the defendants, as distinct from his exposure to asbestos-containing packing and gaskets which the defendants did not design, manufacture, specify, or supply. Thus plaintiff Braaten had not established the required connection between his injury and the defendants' products, and the defendant therefore had no duty to warn of hazards of asbestos-containing packing and gaskets in or connected to their pumps and valves. (Id. at p. 503.)
In Lindstrom v. A-C Product Liability Trust (6th Cir. 2005) 424 F.3d 488, for 31 years as a merchant seaman, plaintiff Lindstrom worked as a licensed engineer on numerous vessels and was allegedly exposed to many pieces of equipment containing asbestos. He sued numerous defendants for products liability after being diagnosed with malignant mesothelioma, which he asserted he developed from exposure to asbestos in products manufactured by the defendants. Lindstrom appealed orders granting summary judgment for five defendants and a verdict after trial for a remaining defendant. (Id. at pp. 491-492.)
(9) Lindstrom stated that in a products liability case proceeding under strict liability theory, the plaintiff must show he was exposed to the defendant's product and that the product was a substantial factor in causing the plaintiff's injury. (Lindstrom v. A-C Product Liability Trust, supra, 424 F.3d at p. 492.) Furthermore to provide a basis for inferring that a product was a substantial factor in causing injury, a plaintiff must provide evidence of substantial exposure for a substantial period of time; minimal exposure is not sufficient. The plaintiff must also show more than that the defendant's product was present where the plaintiff worked; a finding that a product was a substantial factor in causing injury must be based on proof of substantial exposure. (Ibid.)
In Lindstrom, the Sixth Circuit Court of Appeals affirmed orders granting summary judgment and the verdict after trial in favor of the six defendants. The Lindstrom court held, inter alia, that the plaintiff failed to identify any link between the defendants' products and any product containing asbestos with which he came in contact, and that the defendants were not responsible for asbestos-containing material incorporated into their products postmanufacture. (Lindstrom v. A-C Product Liability Trust, supra, 424 F.3d at pp. 493-498.)
Plaintiffs argue that a manufacturer has a duty to warn of hazards arising from foreseeable uses of its product, even if the hazard arises from the addition of a product manufactured by another, that is used in the normal operation of the manufacturer's product, citing DeLeon v. Commercial Manufacturing & Supply Co. (1983) 148 Cal.App.3d 336, 344 [195 Cal.Rptr. *1364 867]. DeLeon, however, does not state this rule. "[I]n DeLeon, the defendant manufacturer's potential liability turned on the factual question of whether it had participated in the design and location of the sorter bin" which the plaintiff was cleaning when she was injured by an exposed rotating line shaft located above the sorter bin. (Taylor, supra, 171 Cal.App.4th at p. 589.) "There is nothing in DeLeon that suggests that a manufacturer may be liable for failing to warn of the dangerous qualities of another manufacturer's product." (Id. at pp. 589-590.)
Plaintiffs also rely on Tellez-Cordova v. Campbell-Hausfeld/Scott Fetzger Co. (2004) 129 Cal.App.4th 577 [28 Cal.Rptr.3d 744] (Tellez-Cordova), and claim that Tellez-Cordova holds that a manufacturer must warn about dangers of injury caused by products of another when such products are foreseeably used in connection with the intended purpose of the defendant's product. The Tellez-Cordova opinion does not contain this rule of law. In contrast to Tellez-Cordova, Merrill's injuries were not caused by any action of Leslie Controls's products, "but rather by the release of asbestos from products produced by others. This is a key difference, because before strict liability will attach, the defendant's product must `cause or create the risk of harm.' [Citation.] Second, unlike the abrasive wheels and discs in Tellez-Cordova, which were not dangerous without the power of the defendants' tools, the asbestos-containing products at issue in our case were themselves inherently dangerous. It was their asbestos contentnot any feature of [Leslie Controls's] equipmentthat made them hazardous. . . . [M]anipulation and removal of the asbestos-containing products at issue here would have presented a danger to [Merrill's] health whether they were used in combination with [Leslie Controls's] equipment, some other type of equipment, or even all by themselves. Tellez-Cordova is therefore not a case in which the defendants had a duty to warn solely of the hazards of other manufacturers' products." (Taylor, supra, 171 Cal.App.4th at pp. 587-588, fn. omitted.)

4. The Component Parts Doctrine Did Not Make Leslie Controls Strictly Liable for Failure to Warn

The component parts doctrine provides a third reason why Leslie Controls is not strictly liable for failure to warn.
(10) "Under the component parts doctrine, the manufacturer of a product component is not liable for injuries caused by the finished product into which the component is incorporated unless the component itself was defective at the time it left the manufacturer." (Taylor, supra, 171 Cal.App.4th at p. 584.) Two policies support this rule. First, suppliers of products with multiple uses should not have to retain experts in a huge variety of areas to determine possible risks associated with each potential use of their products. Second, *1365 the manufacturers of finished products know what they will do with a component, which makes them better able to insure that the component is suitable for their specific applications. (Springmeyer v. Ford Motor Co. (1998) 60 Cal.App.4th 1541, 1554 [71 Cal.Rptr.2d 190].)
Liability of a component part manufacturer depends on (1) whether the component was defective when it left the manufacturer, and (2) whether these defects caused injury. (Taylor, supra, 171 Cal.App.4th at p. 585.) Here the component is the valves manufactured and supplied by Leslie Controls. Those valves were a component of a larger steam production system for naval ships. However, as in Taylor, plaintiffs here cannot meet the second requirement of component part manufacturer liability, which requires that defects in the component part caused injury. That is because plaintiffs have not provided evidence that Leslie Controls supplied the old internal gaskets and packing that Merrill removed or the new internal gaskets and packing that Merrill installed in the valves.
(11) That use of asbestos-containing materials with Leslie Controls valves was foreseeable, and that Leslie Controls anticipated the use of such materials with its valves, does not alter this conclusion. "`[T]he alleged foreseeability of the risk of the finished product is irrelevant to determining the liability of the component part manufacturer because imposing such a duty would force the supplier to retain an expert in every finished product manufacturer's line of business and second-guess the finished product manufacturer whenever any of its employees received any information about any potential problems.'" (Artiglio v. General Electric Co. (1998) 61 Cal.App.4th 830, 838-839 [71 Cal.Rptr.2d 817].) "[F]oreseeability alone is not sufficient to justify the imposition of a duty to warn on the manufacturer of a component part." (Taylor, supra, 171 Cal.App.4th at p. 586.)
Thus under the component parts doctrine, Leslie Controls was not liable for failure to warn.

5. Design Defect

Merrill argues that because Leslie Controls does not challenge the jury verdict finding that Leslie Controls was liable under a design defect theory, the judgment can be affirmed on that ground. We disagree.
(12) The Taylor analysis also applies to design defect: where plaintiffs cannot show that Richard Merrill was exposed to asbestos from a product manufactured, supplied, distributed, or placed in the chain of commerce by Leslie Controls, Leslie Controls cannot be liable for injury caused by a design defect.

*1366 6. Conclusion

For these reasons, we conclude that Leslie Controls is not strictly liable for Merrill's personal injury caused by exposure to asbestos-containing products supplied by other manufacturers.
B.-D.[*]

VI. DISPOSITION
The judgment in favor of Merrill is reversed. The orders granting summary judgment for Elliott Company and granting summary adjudication for Leslie Controls are affirmed. Costs on appeal are awarded in favor of Elliott Company and Leslie Controls.
Croskey, Acting P. J., and Aldrich, J., concurred.
NOTES
[*] Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of part V.B., C., and D.
[1] The unpublished portion of this opinion further concludes that Leslie Controls cannot be held liable in negligence for failure to warn against dangers in asbestos-containing products, used in association with or as replacement parts of Leslie Controls products, which Leslie Controls did not manufacture or supply. The unpublished portion of this opinion also addresses plaintiffs' appeals.
[*] See footnote, ante, page 1348.